**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT HUNTINGTON**

**JAMES FOSTER MATHIS and
CLO ANN MATHIS,**

      **Plaintiffs,**

    **v.**

**BAYER CORPORATION; BAYER
HEALTHCARE PHARMACEUTICALS, INC.;
and BAYER SCHERING PHARMA A.G.,
as successor in interest to
BAYER HEALTHCARE AG,**

      **Defendants.**

**Civil Action No.:** _____ 3:09-cv-1147

## COMPLAINT

Plaintiffs, James Foster Mathis and Clo Ann Mathis ("Plaintiffs" collectively), by and through counsel, file this Complaint seeking judgment against Defendants BAYER CORPORATION, BAYER HEALTHCARE PHARMACEUTICALS, INC., AND BAYER SCHERING PHARMA A.G. (hereinafter collectively "Defendants" or "Bayer"). This case arose out of the Defendants' sale and marketing of the drug Trasylol, also known as aprotinin, and their failure to warn of its dangers.

1.    Plaintiffs are seeking judgment for equitable relief, monetary restitution, and/or compensatory and punitive damages. Plaintiffs make the following allegations based upon their personal knowledge, and upon information and belief, as well as upon their attorneys' investigative efforts, regarding the drug product Trasylol®.

## Jurisdiction and Venue

2.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because complete diversity exists and the amount in controversy exceeds $75,000.00 excluding interest and costs.

3.      This Court has personal jurisdiction over the defendants to this action because they possess the requisite minimum contacts with the forum.

4.      Venue is proper in this district because all the defendants reside in this district, as the term "reside" is defined in 28 U.S.C. § 1391(c) and a substantial part of the events or omissions giving rise to the claim occurred as provided for in 28 U.S.C. §1391(a)(2).

### The Parties

5.      Plaintiffs, James Forrest Mathis and Clo Ann Mathis are individuals who at all relevant times hereto were citizens of Crown City, Ohio.

6.      Defendant Bayer Corporation, (hereinafter "Bayer"), is an Indiana corporation, registered to do business and doing business in West Virginia, with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania, 15205.  At all relevant times, Bayer Corporation, a wholly owned subsidiary of Defendant BAYER SCHERING PHARMA A.G., was engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, testing, warranting and/or selling in interstate commerce, either directly or indirectly, including in the state of West Virginia, the drug Trasylol, also known as Aprotinin.

7.      Defendant Bayer Healthcare, LLC, is a Delaware limited liability company, registered to do business and doing business in West Virginia. At all relevant times, Bayer Healthcare, LLC was engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, and selling Trasylol in interstate commerce, including in the state of West Virginia.

8.      Defendant Bayer Schering Pharma A.G., a global diversified chemical company, is a German corporation, with its principal place of business in Leverkusen, Germany.  Bayer Schering Pharma A.G. is a wholly owned subsidiary

of the managing holding company Defendant Bayer.  At all times relevant herein, Bayer Schering Pharma A.G. was in the business of designing, testing, manufacturing, distributing and promoting certain pharmaceutical products, including Trasylol.  Additionally, at all times relevant, Bayer Corporation and Bayer Healthcare A.G., predecessor to Bayer Schering Pharma, A.G., shared many of the same officers and directors.

9.    Defendant Bayer Healthcare Pharmaceuticals, Inc., as successor in interest of BAYER PHARMACEUTICALS CORPORATION, a wholly owned subsidiary of Defendant Bayer Corporation, is a Delaware corporation, registered to do business and doing business in West Virginia, and successor to Defendant Bayer Pharmaceuticals Corporation, with its principal place of business at 400 Morgan Lane, West Haven, Connecticut 06516.  At all relevant times, Bayer Healthcare Pharmaceuticals, Inc. was engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, and selling Trasylol in interstate commerce, including in the state of West Virginia.  The development of Trasylol for sale in the United States, the conduct of clinical studies, the preparation of regulatory applications, the maintenance of regulatory records, the labeling and promotional activities regarding Trasylol, the decision to suspend marketing of Trasylol, and other actions central to the allegations of this lawsuit, were undertaken by Defendant Bayer Pharmaceuticals Corporation in the State of West Virginia and elsewhere.

## Facts

## History of Trasylol

10.    Trasylol (also known as aprotinin injection) is a naturally occurring proteolytic enzyme inhibitor obtained from bovine lung and is a member of a class of prescription drug products known as antifibrinolytics.  Aprotinin was discovered in the

1930s when Kraut *et al* isolated a kallikrein inhibitor from bovine lung.  It consists of 58 amino acid residues in a single-chain polypeptide, consisting of 6512 daltons and is cross-linked by three disulfide bridges. The reactive bond site for aprotinin is lysine – 15 – alanine – 16, and it forms reversible stoichiometric complexes.  Aprotinin was launched as Trasylol in Germany in 1959.

11.     Trasylol was approved by the FDA in 1993 and is used to control bleeding in open heart surgeries.  It is supplied as a clear, colorless, sterile isotonic solution for intravenous administration.

12.     Trasylol was indicated for prophylactic use to reduce perioperative blood loss and the need for blood transfusions in patients undergoing cardiopulmonary bypass surgery.

13.     Trasylol is a broad spectrum protease inhibitor, which modulates the systemic inflammatory response associated with cardiopulmonary bypass surgery. The effects of Trasylol use in cardiopulmonary bypass surgery involve a reduction in inflammatory response, which translates into a decreased need for blood transfusions.

14.     Trasylol inhibits pro-inflammatory cytokine release and maintains glycoprotein homeostasis.

15.     From 1994 to 2007, Bayer sold Trasylol in the United States in 100 and 200 milliliter vials.  When used during surgery, Trasylol was generally delivered to the patient intravenously in the operating room by a health care professional and without the specific knowledge of the patient.

16.     Amicar® (epsilon-aminocaproic acid or "EACA") and Cyklokapron® (tranexamic acid or "TEA") are additional drug products in the antifibrinolytic class. EACA was first sold in the United States in or about 1964, and TEA was first sold in

the United States in or about 1986.

17.     In 1987, a study was published by Dr. David Royston *et al.* in *The Lancet* suggesting that the use of aprotinin in repeat coronary artery bypass graft (also known as "CABG") surgery would reduce blood loss and the need for transfusions in patients undergoing CABG surgery.

18.     In December 1993, the U.S. Food and Drug Administration (the "FDA") approved Trasylol for sale in interstate commerce in the United States as a prescription drug product and approved Trasylol's principal label, known as the "Package Insert," based on the criteria employed by the federal agency pursuant to the federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq.* In that Package Insert, Trasylol was indicated "for prophylactic use to reduce perioperative blood loss and the need for blood transfusion in patients undergoing cardiopulmonary bypass in the course of repeat coronary artery bypass graft surgery [and] in selected cases of primary coronary artery bypass graft surgery where the risk of bleeding is especially high . . . or where transfusion is unavailable or unacceptable."

19.     According to the FDA, the risk of renal toxicity associated with exposure to Trasylol was known to Bayer in 1993. According to Dr. Dennis Mangano, M.D., Ph.D., of the Ischemia Research and Education Foundation, despite pre-existing clinical and animal evidence, only a minority of 45 clinical studies conducted on aprotinin exposure during surgery prior to FDA's approval in 1993 commented on renal function and, of those, none had an adequate number of patients to determine, with statistical significance, whether Trasylol exposure increased the risk of renal failure.

20.     In October 1994, the FDA approved amendments to the Trasylol Package Insert to provide an optional, lower dosage regimen of aprotinin.

333076                                              5

21.    In August 1997, the FDA approved amendments to the Trasylol Package Insert to highlight information about the risk of anaphylactic shock and certain other adverse effects associated with exposure to aprotinin.

22.    In August 1998, the FDA approved amendments to the Trasylol Package Insert. In that Package Insert, Trasylol was indicated for use during both primary and repeat CABG surgeries.

23.    Between August 1998 and December 2006, no material safety information was reviewed and approved or deemed not approvable by the FDA for inclusion in the Trasylol Package Insert.

24.    The FDA required Bayer to conduct certain post-approval clinical studies and/or evaluations and analyses as conditions of its approval of the revised Package Insert in 1998. Bayer did not fulfill those obligations and/or did not conduct those clinical studies and/or evaluations and analyses so as to generate clinically meaningful information about the safety of Trasylol.

25.    Further, Bayer failed to conduct any clinical studies comparing the safety and efficacy of Trasylol with EACA and/or TEA and failed to conduct any epidemiological studies to assess extent and nature of the risk of renal failure and/or death.

26.    Bayer aggressively promoted Trasylol to physicians through medical journal advertisements, mass mailings, and direct communications from the Bayer sales force, among other methods. Bayer sponsored continuing medical education ("CME") seminars and paid physicians to advocate the use of Trasylol, orally and in writing, over the use of other antifibrinolytics and in various types of surgery, and to downplay the significance of the adverse effects of Trasylol and in particular the risk of renal injury.

27.     Bayer regularly represented in its advertising and promotional messages that the risk of renal and certain other injuries including death, associated with exposure to Trasylol were "comparable to placebo," "had no adverse effect on renal function" and other similar false and misleading messages. These messages represented to physicians that Trasylol did not cause renal injuries and/or did not cause more injuries than the number of injuries resulting from surgery without the use of Trasylol. In other advertising and promotional messages, Bayer overstated the benefits of Trasylol.

28.     According to Bayer, since its approval, an estimated 4.3 million patients have been given Trasylol.

29.     Bayer estimated that Trasylol generated about $293 million in sales in 2005 alone, making it the company's 11th largest-selling drug.

30.     In late 2005, Bayer forecast that Trasylol would someday generate upwards of $600 million annually.

**Trasylol's Association with the Increased Risk of Renal Failure**

31.     On January 26, 2006, *The New England Journal of Medicine* (NEJM) published an article by Mangano *et al* reporting an association of Trasylol with, among other things, serious renal toxicity and renal failure and ischemic events in patients undergoing coronary artery bypass grafting surgery.  This study was an observational study of patients who received either Trasylol, one of two alternative drugs intended to decrease perioperative bleeding (aminocaproic acid or tranexamic acid), or no specific drug treatment.  Overall, Dr. Mangano found more than a doubling in the risk of renal injury in patients exposed to aprotinin compared to those patients not exposed (odds ratio of 2.52 (1.66-3.82)) as well as an increased risk of cardiovascular and cerebrovascular adverse events and death.

32.     On January 20, 2006, in the medical journal *Transfusion*, Dr. Karkouti *et al.* also showed an association between the use of aprotinin and renal toxicity among patients undergoing cardiac surgery with cardiopulmonary bypass.

33.     In February 2006, the FDA issued a public health advisory regarding the results of the Mangano and Karkouti studies and expressing a desire to hold an advisory committee meeting to discuss the safety of Trasylol.

34.     Upon receiving the Mangano study, Bayer established a "Trasylol Steering Committee" ("TSC") that included numerous highly ranked Bayer employees, both from Bayer's United States offices, but also from the Bayer home offices in Germany, to oversee Bayer's total response to the studies and any regulatory responses. Bayer's TSC began a coordinated response to the Mangano and Karkouti studies intended to call their science and findings into question and lay the groundwork for a favorable result from the FDA's proposed advisory committee meeting. As part of this assault on the studies, Bayer wrote to the FDA to allege "serious methodological and statistical flaws" in the studies.

35.     The FDA evaluated this study, along with other studies in the literature, and reports submitted to the FDA through the MedWatch program, to determine if labeling changes or other actions were warranted.

36.     While the FDA was continuing its evaluation it provided the following recommendations to healthcare providers and patients:

> Physicians who use Trasylol should carefully monitor patients for the occurrence of toxicity, particularly to the kidneys, heart, or central nervous system and promptly report adverse event information to Bayer, the drug manufacturer, or to the FDA MedWatch program, as described at the end of this advisory.
>
> Physicians should consider limiting Trasylol use to those situations where the clinical benefit of reduced blood loss

is essential to medical management of the patient and
outweighs the potential risks.

**FDA September 21, 2006 Advisory Board Committee Meeting
and the Walker ("i3") Study**

37.   On or before February 1, 2006, and within two weeks of the publication
of Dr. Mangano's research, high level managers at Bayer contacted Dr. Alexander
Walker, a professor at Harvard's School of Public Health, and a researcher at i3
Drug Safety, a company that conducts drug safety studies for the pharmaceutical
industry and provides "integrated global pharmacovigilance services."   Bayer
wanted to conduct its own study to determine, for the first time, whether Trasylol
was as safe as alternative antifibrinolytics.  This became known as the "i3 Study."

38.   On or about February 8, 2006, the FDA issued a Public Health
Advisory on the results of Dr. Mangano's research on Trasylol.  The FDA also
stated that it would hold an advisory committee meeting on Trasylol.

39.   On or about February 20, 2006, Bayer disclosed to German regulators
that it was considering conducting a study on Trasylol's safety using a database
from the United States.  On information and belief, Bayer was referring to the i3
Study.

40.   On or about February 23, 2006, Bayer's upper management contacted
Dr. Walker and asked him to present the results of the i3 Study to the FDA at the
planned September meeting.

41.   On or about June 1, 2006, Bayer approved the i3 Study, and
communicated its approval to Dr. Walker on or about June 2, 2006.  At that time,
Bayer told Dr. Walker to complete the i3 Study in time to for the FDA Advisory
Committee meeting, then scheduled for September 21, 2006. The FDA asked Bayer
to submit information relative to Trasylol and, specifically, the issues raised by the

Mangano and Karkouti studies. Bayer submitted voluminous information to the FDA and had numerous contacts with the agency about Trasylol and the meeting, but failed to inform the FDA about the work being conducted by Dr. Walker and i3.

42.    The i3 study confirmed the findings of Drs. Karkouti and Mangano. The i3 study examined the medical records of approximately 67,000 patients, of whom 30,000 had received Trasylol.

43.    On or about June 19, 2006, Bayer forwarded an executed copy of its contract for the i3 Study to Dr. Walker.  The cost of the study was $700,000 to be paid in five installments.  Under the contract, preliminary results were due within three months (on or about September 19, 2006), and a final report was due a month after that.

44.    On or about June 28, 2006, Bayer had a telephone conference with the FDA, but failed to inform the FDA about the i3 Study during that call.

45.    On or about July 13, 2006, Bayer again asked Dr. Walker to present the results of the i3 Study at the FDA Advisory Committee meeting scheduled for September 21, 2006.  Bayer informed Dr. Walker that a written submission in advance of the Advisory Committee meeting was due to the FDA by August 18, 2006.

46.    On or about July 16, 2006, members of Bayer's upper management met to prepare for a meeting with FDA officials scheduled for the next day.  Some Bayer officials present at the meeting recall discussing the i3 Study and whether to inform the FDA about the i3 Study at the next day's meeting.

47.    On or about July 17, 2006, members of Bayer's upper management met with FDA officials in Silver Spring, Maryland.  No one from Bayer informed the FDA officials of the i3 Study at that meeting.

333076
10

48.     On the same day as the July 17, 2006, FDA meeting in Maryland, Dr. Walker confirmed that he would present the results of the i3 Study at the FDA Advisory Committee meeting.  Another i3 scientist, John Seeger, stated that the i3 Study results would not be ready in time for the pre-meeting submission, but suggested that the written submission include a description of the i3 Study.

49.     On or about July 22, 2006, Bayer held a mock panel meeting in New York to prepare for the FDA Advisory Committee meeting.  The participants in the mock FDA meeting did not discuss the i3 Study.

50.     On or About August 17, 2006, Bayer made its pre-meeting written submission to the FDA.  It failed to mention the i3 Study.

51.     On or about August 17, 2006, i3 personnel told Bayer that the i3 Study was on track to deliver preliminary results on September 19, 2006, as stated in the contract.  At the same time, i3 scientist John Seeger suggested that he and Dr. Walker meet with Bayer management in Lisbon, Portugal in late August 2006, to discuss the i3 Study.  That meeting occurred on or about August 26, 2006.

52.     On or about August 19, 2006, Bayer held a second mock panel meeting in New York to prepare for the FDA Advisory Committee meeting.  At that panel meeting, a member of Bayer's management team falsely reported that no results from the i3 Study would be available before the FDA Advisory Committee meeting.

53.     On or about September 7, 2006, Dr. Walker informed Bayer that the preliminary results were ready, and that he was prepared to give Bayer a summary of the findings.  On September 8, 2006, however, Dr. Walker withdrew his offer to discuss the results.

54.     On or about September 9, 2006, Bayer held a third mock panel

meeting in New York to prepare for the FDA Advisory Committee meeting.

55.    On or before September 14, 2006, Bayer received the preliminary report of the i3 Study's findings.  The preliminary report suggested that patients who received Trasylol were at an increased risk for death, kidney failure, congestive heart failure, and stroke.

56.    On or about September 20, 2006, Bayer held a final mock panel meeting in preparation for the FDA Advisory Committee meeting scheduled for the next day.  The participants in that meeting did not mention the i3 Study or that the results of the i3 study confirmed the results of the Trasylol studies being discussed at the meeting.  In fact, at no point did Bayer even mention that it had commissioned such a study to create "independent data" by which to compare the Mangano and Karkouti studies.

57.    The FDA Advisory Committee met on September 21, 2006, to discuss its findings regarding the safety of Trasylol and determine whether the warning on Trasylol needed to be changed.  No one from Bayer mentioned the i3 Study or the preliminary report Bayer received on or before September 14, 2006.  Bayer did not bring Dr. Walker to the meeting to discuss his findings.

58.    After reviewing what it considered to be all of the available data on the safety of Trasylol, the FDA advisory committee ultimately voted 18-0 to recommend that there should be no change to the safety labeling of Trasylol.

59.    Bayer disclosed the preliminary report to the FDA on September 27, 2006.

60.    A Bayer "investigation" of how or why the i3 study was not presented to the FDA's advisory committee found it the result of "regrettable human error." Bayer, of course, also continued to publicly question the science and results of its own

study. Bayer continued to sell Trasylol despite these studies proving the danger of the drug.

61.    On September 29, 2006, the FDA issued a second Public Health Advisory related to Trasylol which noted the i3 study and that the FDA did not have access to this study at the September 21, 2006, advisory committee meeting. Essentially, the FDA reiterated its February 2, 2006, Public Health Advisory, noting that studies questioning the safety of Trasylol existed.

62.    As a result of the recommendations of the FDA's advisory committee, the articles authored by Mangano *et al.* and Karkouti *et al.,* along with other reports and data known to and/or in the possession of the Defendants, the FDA required that the Package Insert for Trasylol include additional Warnings and Precautions, beginning in December 2006. The Warnings and Precautions included the risks of renal injury and renal failure associated with the use of aprotinin, and recommended that aprotinin be reserved for patients who are at an increased risk of blood loss and blood transfusion.

63.    On December 15, 2006, the FDA sent an Alert to healthcare professionals advising of a change in the product label for Trasylol:

> The new labeling for Trasylol (December 2006) has a more focused indication for use, a new Warning about renal dysfunction, a revised Warning about anaphylactic reactions, and a new Contraindication.  Trasylol is now indicated only for prophylactic use to reduce perioperative blood loss and the need for blood transfusion in patients who are at *an increased risk for blood loss and blood transfusion* undergoing cardiopulmonary bypass in the course of coronary artery bypass grafting (CABG) surgery.   Trasylol should be administered only in the operative setting where cardiopulmonary bypass can be started quickly.   Trasylol should not be administered to any patient with a known or suspected exposure to Aprotinin within the past 12 months.
>
> FDA is evaluating additional recently submitted epidemiological safety study data (discussed below), in the

context of all other safety and efficacy information available on Aprotinin. This review may result in other actions, including additional changes to the full prescribing information (product labeling).

64.     In December 2006, Bayer revised the label for Trasylol to include a specific statement in the WARNING section of the label that use of Trasylol creates an increased risk of renal dysfunction and renal failure.

65.     On January 25, 2007, Bayer announced it was discontinuing three clinical studies of Trasylol. The studies were to investigate the safety and efficacy of Trasylol with regard to transfusion requirements and blood loss in adults undergoing spinal fusion surgery, pneumonectomy or esophagectomy for cancer, and total cystectomy in bladder cancer.

66.     In February 2007, Bayer responded to the study and commentary published in the Journal of American Medical Association (JAMA).  In commenting on the study published by Dr. Mangano in the January 2006 JAMA, Bayer stated, "Bayer believes the methodological and analytical approaches used in earlier study were not reliable and do not support the authors' reported conclusions."  Bayer went on to say:  "Bayer believes that the results of this study should not serve as a basis for affecting the use of aprotinin in clinical practice."

67.     On September 12, 2007, a joint meeting of the FDA's Cardiovascular and Renal Drugs Advisory Committee and Drug Safety and Risk Management Advisory Committee was held. The purpose of the meeting was to follow up on the September 2006 meeting, as well as to discuss the findings of additional studies showing an increased mortality rate in Trasylol-treated patients. At that meeting, the advisory committee voted 16-1 to recommend that Bayer be allowed to continue selling Trasylol with the label revisions instituted in December 2006.

68.     In October 2007, Bayer was notified that the Executive Committee of a Canadian-based clinical study of Trasylol in high-risk cardiac surgery patients had halted the study. A planned periodic data analysis in this clinical trial, the *Blood conservation using antifibrinolytics: A randomized trial in a cardiac surgery population* ("BART") study conducted by the Ottawa Health Research Institute, indicated an increase in all-cause mortality (that almost reached conventional statistical significance for 30-day mortality) for patients in the Trasylol treatment arm compared to patients who received the alternative drug products EACA or TEA.

69.     On November 5, 2007, Bayer suspended worldwide marketing of Trasylol. The FDA stated at that time: "[I]t is not possible to determine and identify a population of patients undergoing cardiac surgery for which the benefits of Trasylol outweigh the risks."

70.     In May 2008, the New England Journal of Medicine published an article by Hebert, *et al.* finding an association of Trasylol with increased mortality when compared with other antifibrinolytic agents. Sadly, the lead author, Paul Hebert, concluded, "This study could have been done by the company [Bayer] five to ten years ago."

71.     Following publication of the BART study, on May 14, 2008 Bayer notified the FDA of its intent to remove all remaining supplies of Trasylol from hospital pharmacies and warehouses. The following day, Trasylol production and marketing was terminated worldwide.

### General Allegations Concerning Plaintiff

72.     On or about June 28, 2004, James Forrest Mathis ("Mr. Mathis") underwent an aortic valve replacement and coronary artery bypass graft x4 at St. Mary's Medical Center in Huntington, West Virginia.

73.     With no contributory negligence on his part, Mr. Mathis was administered Trasylol.

74.     As a direct, proximate, and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, Mr. Mathis began experiencing medical complications soon after his coronary artery bypass graft x4, including acute renal failure.

75.     As a direct, proximate, and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, Mr. Mathis suffered renal failure and suffered other permanent injuries.

## Claims for Relief

### Count I – Negligence/Wantonness

76.     Plaintiffs incorporate by reference all the above paragraphs as if they were set forth fully.

77.     At all relevant times, Defendants owed the Plaintiffs a duty of reasonable care and safety.

78.     Defendants' duties included, but were not limited to, carefully and properly designing, testing, manufacturing, licensing, packaging, promoting, advertising, selling, and/or distributing Trasylol into the stream of commerce, and providing warnings with regard to this drug.

79.     Defendants negligently, carelessly, and/or wantonly breached the above-described duties to Plaintiffs by committing negligent and/or wanton acts and/or omissions including but not limited to:

(A) Defendants negligently and/or wantonly failed to use ordinary care in designing, testing, and manufacturing Trasylol so as to avoid the high risk to users of unreasonable, dangerous

16

side-effects, some of which are fatal, such as renal failures;

B) Defendants negligently and/or wantonly failed to accompany Trasylol with adequate warnings that would alert doctors, consumers, and other users to the potential adverse side effects associated with the use of these drugs and the nature, severity and duration of such adverse effects;

(C) Defendants negligently and/or wantonly failed to conduct adequate pre-clinical testing and post-marketing surveillance to determine the safety and side effects of Trasylol;

(D) Defendants negligently and/or wantonly failed to warn Plaintiffs prior to actively encouraging the sale of Trasylol, either directly or indirectly, orally or in writing, about the possibility of death as a result of the use of these drugs;

(E) Defendants negligently and/or wantonly continued to promote the safety of Trasylol®, while downplaying any risks, even after Defendants knew of the risk of renal failure; and

(F) Defendants were otherwise careless or negligent and/or wanton.

80.     Although Defendants knew or should have known that Trasylol caused unreasonably dangerous side effects which many users would be unable to remedy by any means, Defendants continued to market this drug to doctors for use in cardiac surgeries, when there were safer and less expensive alternatives available.

81.     Defendants knew or should have known that consumers, like Mr. Mathis, would suffer injury as a result of Defendants' failure to exercise ordinary care, as described above.

82.   As a direct and proximate cause of Defendants' negligent and/or wanton acts and/or omissions, Mr. Mathis suffered acute renal failure and suffered permanent injuries.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, in an amount determined by a jury sufficient to compensate them for the losses they suffered, punitive damages, plus costs and interest, and such other and further relief to which Plaintiffs may be entitled.

### Count II – Product Liability/AEMLD

83.   Plaintiffs incorporate by reference all the above paragraphs as if they were set forth fully.

84.   At all relevant times, Defendants designed, manufactured, and tested Trasylol.

85.   At all relevant times, Defendants were engaged in the business of distributing and selling Trasylol.

86.   Defendants sold the Trasylol, which was administered to n during his cardiac surgery, as alleged in this Complaint.

87.   The Trasylol administered Mr. Mathis was defective and, because of its defects, was unreasonably dangerous to persons who might reasonably be expected to require its use. In addition, this drug was dangerous to the extent beyond that which could reasonably be contemplated by Mr. Mathis, and any benefit of this drug was far outweighed by the serious and undisclosed risks of its use.  Among other things, Trasylol is defective in design and failure to warn.

88.   The Trasylol administered to Mr. Mathis was defective at the time it was distributed by the Defendants or left its control.

89.     The Trasylol administered to Mr. Mathis was expected to reach the user without substantial change in the condition in which it was sold.

90.     The Trasylol administered to Mr. Mathis reached his without substantial change in the condition in which it was sold.

91.     Mr. Mathis was a person who would reasonably be expected to use Trasylol.

92.     The defects in the Trasylol administered to Mr. Mathis were a direct and proximate cause of the injuries to him as set forth in this Complaint.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, in an amount determined by a jury sufficient to compensate them for the losses they suffered, punitive damages, plus costs and interest, and such other and further relief to which Plaintiffs may be entitled.

### Count III - Breach of Warranties

93.     Plaintiffs incorporate by reference all the above paragraphs as if they were set forth fully.

94.     Trasylol was designed, tested, manufactured, distributed, promoted and sold by the Defendants; and was expected to, and did, reach Mr. Mathis without a substantial change in its condition.

95.     Defendants, through their advertising and promotional materials, expressly and impliedly warranted that Trasylol was safe for the use for which it were intended, namely as a means to reduce perioperative bleeding in patients undergoing cardiac surgery.

96.     Defendants breached these express and implied warranties because Trasylol was unsafe in light of the risk of life-threatening side effects associated with its use, including, but not limited to, stroke.

97.     Mr. Mathis relied to his detriment on Defendants' express and implied warranties.

98.     As a direct and proximate result of Defendants' breach of express and implied warranties, Plaintiffs suffered injuries, as set forth in this Complaint.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for damages for breach of warranty, in an amount determined by a jury, plus costs and interest, and such other and further relief to which Plaintiffs may be entitled.

### Count IV - Strict Liability – Failure to Warn

99.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

100.    Defendants are liable to Plaintiffs failure to provide adequate warnings and other clinically relevant information and data regarding the appropriate use of Trasylol to Plaintiffs and to the health care providers that prescribed and administered Trasylol to them.

101.    Defendants, as manufacturers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks of injury and death associated with the use of Trasylol, either compared to the use of other drug products in the class of

antifibrinolytics and/or compared to the use of no antifibrinolytics, were inadequate.

102.    Plaintiffs did not have the same knowledge as Defendants and no adequate warning or other clinically relevant information and data was communicated to Mr. Mathis or to his physicians.

103.    Defendants had a continuing duty to provide consumers, including Mr. Mathis, and his physicians with warnings and other clinically relevant information and data regarding the risks and dangers associated with Trasylol, as it became or could have become available to Defendants.

104.    Defendants marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drug, Trasylol, to health care providers empowered to prescribe and dispense Trasylol to consumers, including Mr. Mathis, without adequate warnings and other clinically relevant information and data. Through both omission and affirmative misstatements, Defendants misled the medical community about the risk and benefit balance of Trasylol, which resulted in injury to Plaintiffs.

105.    Despite the fact that Defendants knew or should have known that Trasylol caused unreasonable and dangerous side effects when either compared to the use of other drug products in the class of antifibrinolytics, and/or compared to the use of no antifibrinolytic, which many users would be unable to avoid by any means, they continued to promote and market Trasylol without stating that there existed safer and more or equally effective alternative drug products and/or providing adequate clinically relevant information and data.

106.    Defendants knew or should have known that consumers, and Plaintiffs specifically, would foreseeably and needlessly suffer injury as a result of Defendants' failures.

107.   Defendants failed to provide timely and adequate warnings to physicians, distributors, and consumers, including Mr. Mathis and to his physicians, in the following ways:

(1) Defendants failed to include adequate warnings and/or providing adequate clinically relevant information and data that would alert Mr. Mathis and his physicians to the dangerous risks of Trasylol;

(2) Defendants failed to provide adequate post-marketing warnings and instructions after the Defendants knew or should have known of the significant risks of, among other things, kidney failure, stroke and death;

(3) Defendants continued to aggressively promote Trasylol, even after they knew or should have known of the unreasonable risks of injury and death from this drug.

108.   Defendants had a constitutionally-protected right to provide Mr. Mathis and his physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Trasylol, and/or that there existed safer and more or equally effective alternative drug products.

109.   By failing to provide Mr. Mathis and his physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Trasylol, and/or that there existed safer and more or equally effective alternative drug products, Defendants breached their duty of reasonable care and safety.

110.   Defendants' actions described above were performed willfully, intentionally, and with reckless disregard of the life and safety of the Plaintiffs and the public.

111.   Defendants' actions described above violated the federal and state Food, Drug and Cosmetic Acts and rendered Trasylol misbranded.

112.   As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Mr. Mathis was exposed to Trasylol and suffered and continues to suffer the injuries and damages set forth in this Complaint.

### Count V - Strict Liability – Design Defect

113.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

114.   Defendants are liable to Plaintiffs for the injuries and damages sustained by Plaintiffs due to the defective design and/or formulation of Trasylol.

115.   At all times material to these allegations, Defendants manufactured, distributed, and sold Trasylol, which was administered to Mr. Mathis during surgery, as alleged in this Complaint.

116.   Defendants, as manufacturers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field.

117.   The Trasylol administered to Mr. Mathis was defective in design or formulation in the following respects:

(1) When it left the hands of the Defendants, this drug was unreasonably dangerous to the extent beyond that which could reasonably be contemplated by Mr. Mathis or his physicians;

(2) Any benefit of this drug was outweighed by the serious and undisclosed risks of its use when prescribed and used as the Defendants intended;

(3) The dosages and/or formulation of Trasylol sold by the Defendants were unreasonably dangerous;

(4) There are no patients for whom the benefits of Trasylol outweighed the risks; and/or

(5) There are no patients for whom Trasylol is a safer and more efficacious drug than other drug products in its class.

118.   The Trasylol administered to Mr. Mathis was defective at the time it was distributed by the Defendants or left their control.

119.   The Trasylol administered to Mr. Mathis was expected to reach the user without substantial change in the condition in which it was sold.

120.   The Trasylol administered to Mr. Mathis reached him without substantial change in the condition in which it was sold.

121.   Mr. Mathis was a patient whom the Defendant reasonably expected would be administered Trasylol.

122.   Defendants were entitled to withdraw Trasylol from the market at any time, but failed to do so in a timely and responsible manner.

123.   The defects in the Trasylol administered to Mr. Mathis were a direct and proximate cause of the injuries and damages sustained by Plaintiffs as set forth in this Complaint.

## Count VI - Negligence *Per Se*

124.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

125.   Defendants have an obligation not to violate the law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, warning of the risks and dangers of the drug products it sells.

126.   Defendants' acts constitute an adulteration, misbranding, or both, as

defined by the federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq.* and parallel state Food, Drug and Cosmetic Acts and state common law. Said acts constitute a breach of duty subjecting Defendants to civil liability for the damages arising there from inasmuch as such acts constitute negligence *per se.*

127.   Mr. Mathis, as patient and purchaser exposed to Trasylol, is within the class of persons the statutes and regulations described above are designed to protect, and Mr. Mathis' injuries are the type of harm these statutes and regulations are intended to prevent.

128.   As a direct and proximate cause of Defendants' negligent acts and/or omissions, Mr. Mathis suffered renal failure and resultant permanent injuries.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, in an amount determined by a jury, plus costs and interest, and such other and further relief to which Plaintiffs may be entitled.

### Count VII – Fraudulent Concealment

129.   Plaintiffs incorporate by reference all the above paragraphs as if they were set forth fully.

130.   At all times relevant hereto, Bayer knew or should have known of the dangers of administering Trasylol to patients such as Mr. Mathis.

131.   Because of the Defendants' specialized position and unique knowledge of these dangers and risks, Defendants had a duty to disclose to Mr. Mathis and the public the hazards associated with administering Trasylol during surgery.

132.   Defendants nevertheless intentionally suppressed and/or concealed their knowledge of these hazards and the risks associated with administering Trasylol to the public, including Mr. Mathis.  Defendants intentionally misrepresented results of their own study, as well as suppressed findings from its own study, which

supported Dr. Mangano's findings that Trasylol increased a patient's risk for kidney failure, kidney damage, stroke and/or death.

133.    As a proximate result of Defendants' suppression and/or concealment of their knowledge of this information related to Trasylol, Plaintiffs have suffered harm.

134.  Those public misrepresentations and omissions include, but are not limited to, those set forth in the general allegations section of this Complaint. Those misrepresentations and omissions further include, but are not limited to, the following:

(1) Defendants failed to disclose that their pre-clinical and clinical testing and post-marketing surveillance were inadequate to determine the safety and side effects of Trasylol, compared to alternative drug products in its class or compared to the use of no drug products;

(2) Defendants failed to timely disclose, and/or intentionally concealed, data showing that Trasylol use dramatically increased the risk of injury and death, either compared to the use of alternative drug products in its class or compared to the use of no drug products;

(3) Defendants failed to include adequate warnings with Trasylol about the potential and actual risks, and nature, scope, severity, and duration of any serious side effects of this drug, either compared to the use of alternative drug products in its class or compared to the use of no drug products;

(4) Defendants concealed and continue to conceal past and present facts including that, as early as the mid-1990's, Defendants were aware of and concealed their knowledge of an association between the use of Trasylol and dangerous side effects from the consuming public, including Plaintiffs;

135.    Defendants' above-described acts and/or omissions were performed willfully, intentionally, and with reckless disregard for Plaintiffs and the public.

136.    Defendants knew or should have known that these representations were false and that Mr. Mathis and his physicians would rely on them. Defendants were obligated to disclose the foregoing risks, but failed to adequately and timely do so even after they were in possession of information concerning those risks. Defendants' representations that Trasylol was safe for its intended use, either compared to the use of alternative drug products in its class or compared to the use of no drug products, were false. Trasylol was, in fact, unreasonably dangerous to the health of Mr. Mathis when used during surgery, and there were alternative products in the same class of drug products available that were less expensive, equally or more effective, and posed less risks.

137. In the alternative, Defendants failed to exercise reasonable care in ascertaining the accuracy of the information they provided regarding the safe use of Trasylol and communicating that information to Mr. Mathis and his physicians.

138. At the time of Defendants' fraudulent misrepresentations and active concealment, Mr. Mathis and his physicians were unaware of the falsity of the foregoing representations, nor was Mr. Mathis or his physicians aware that material facts concerning Trasylol had been concealed or omitted. In reliance upon Defendants' misrepresentations, Plaintiff's physicians were induced and did administer Trasylol to Mr. Mathis before, during, and/or after surgery.

139.    Defendants are obligated to provide consumers like Mr. Mathis and his health care providers with scientific information and data regarding the association between exposure to Trasylol and the risk of injury and death and could have distributed that information to Mr. Mathis and his physicians even if that information

was not included in the Package Insert. Defendants were obligated to provide consumers, like Mr. Mathis and his health care providers, with scientific information and data which indicated that Trasylol was unreasonably dangerous, that there were no patients in whom the benefits of Trasylol outweighed the risks, either compared to the use of alternative drug products in its class or compared to the use of no drug products.

140.   If Mr. Mathis and his physicians had known the true facts concerning the risks of the use of Trasylol, either compared to the use of alternative drug products in its class or compared to the use of no drug products, they would not have used Trasylol and would have used one of the alternatives in that class of drug products.

141.   The reliance of Mr. Mathis and his physicians upon Defendants' misrepresentations was justified, among other reasons, because said misrepresentations and omissions were made by individuals and entities who were in a position to know the true facts concerning Trasylol, while Mr. Mathis and his physicians were not in a position to know the true facts. Defendants overstated the benefits and safety of Trasylol and concomitantly downplayed the risks in its use, compared to the use of alternative drug products in its class or to the use of no drug products, thereby inducing Mr. Mathis' physicians to use Trasylol in lieu of other, safer alternatives. At all times relevant hereto, Defendants' corporate officers, directors and/or managing agents knew or should have known of, and ratified the acts of Defendants, as alleged herein.

142.   Defendants' misrepresentations, concealment, suppression and omissions were made willfully, wantonly, uniformly, deliberately or recklessly, in order to induce Mr. Mathis to be administered Trasylol.   Mr. Mathis and his

physicians did reasonably and justifiably rely upon the material misrepresentations and omissions made by the Defendants when agreeing to utilize Trasylol.

143.   As a direct and proximate result of the reliance of Mr. Mathis and his physicians on Defendants' misrepresentations and concealment concerning the risks and benefits of Trasylol, Plaintiff suffered injuries and damages, as set forth in this Complaint.

WHEREFORE, Plaintiffs demand judgment against Defendants jointly and severally on their claim for fraudulent concealment.

### Count VIII - Unfair And Deceptive Trade Practices

144.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

145.   Under state laws, Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, development, manufacture, promotion, and sale of the drug products.

146.   Defendants financed, assisted, supported and participated in the promotion and use of Trasylol in order to create consumer demand for the drug.

147.   Defendants deliberately misrepresented the safety of Trasylol and intentionally concealed the risks attendant to use of the drug. Through their misrepresentations, Defendants intentionally affected the decisions of consumers and their health care providers to purchase, prescribe and use Trasylol, and to exclude the options of not using a drug product or using a substantially cheaper alternative drug from the same class.

148.   Defendants, while engaged in the conduct and practices identified above, committed one or more violations of state laws, including, but not limited to, the following:

333076

29

(1)  Defendants  made  false  and  misleading  representations  and omissions of material facts regarding Trasylol;

(2)  Defendants  concealed  and  otherwise  failed  to  publicize  the  risks and injuries associated with Trasylol in order to promote sales of the drug and maximize profits; and

(3)  Defendants  engaged  in  advertising  and  promotion  of  Trasylol without conducting sufficient pre-clinical, clinical and post-approval testing and adequate post-marketing surveillance and analyses of Trasylol.

149.   Defendants thereby intended to and did affect the price of Trasylol, unfairly  and  deceptively  maintained  the  price  of  Trasylol  at  an  inflated  level  not otherwise  obtainable  and  caused  Plaintiffs  and  the  consuming  public  generally  to pay more for the drug than was warranted or than they would otherwise have paid in the absence of Defendants' misrepresentations and concealment.

150.   The  above-described  conduct,  practices,  acts  and  omissions  were immoral,  oppressive,  unethical  and/or  unscrupulous,  in  violation  of  international treaty and law, and/or offend public policy.

151.   The  above-described  conduct,  practices,  acts  and  omissions  caused consumers  permanent  and  substantial  financial  loss,  which  loss  could  not reasonably have been avoided, and which was not outweighed by any countervailing benefit to the consuming public. Consumers in general, and Plaintiffs in particular, incurred unnecessary expenses for a product that was purchased only because of the  unfair,  unscrupulous,  oppressive  and/or  deceptive  acts  or  practices  of  the Defendants.

152.   As a consequence of Defendants' wrongful conduct, Plaintiffs suffered an ascertainable financial loss: the difference between the price paid for Trasylol as

a result of the Defendants' unfair trade practices and the cost of any of the substantially cheaper, and safer, drug alternatives.

## Count IX - Unjust Enrichment

153.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

154.   As the intended and expected result of their conscious wrongdoing, Defendants have profited and benefited from the purchase and use of Trasylol by Mr. Mathis.

155.   Defendants have voluntarily accepted and retained these profits and benefits derived from Mr. Mathis with full knowledge and awareness that, as a result of Defendants' wrongdoing, Mr. Mathis was not receiving a product of the quality, nature or fitness that had been represented by Defendants, or that Mr. Mathis, as reasonable consumer, expected to receive.

156.   By virtue of the conscious wrongdoing alleged above, Defendants have been unjustly enriched at the expense of Plaintiffs, who is entitled to in equity, and hereby seeks, the disgorgement and restitution of Defendants' wrongful profits, revenues and benefits, to the extent and in the amount deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

## Count X - Gross Negligence/Malice

157.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

158.   The wrongs done by Defendants were aggravated by the kind of malice, fraud, and reckless disregard for the rights of others, the public, and Plaintiffs for which the law would allow, and which Plaintiffs will seek at the appropriate time

under governing law for the imposition of exemplary damages, in that Defendants' conduct:

(1) When viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, and Defendants were actually, subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others; or

(2) included a material representation that was false, with Defendants knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation is acted on by Plaintiffs. Plaintiffs relied on the representation and suffered injury as a proximate result of this reliance.

159.   Plaintiffs therefore will seek to assert claims for exemplary damages at the appropriate time under governing law in an amount within the jurisdictional limits of the Court.

160.   Plaintiffs also allege that the acts and omissions of Defendants, whether taken singularly or in combination with others, constitute gross negligence that proximately caused the injuries to Plaintiffs. In that regard, Plaintiffs will, as noted, seek exemplary damages in an amount that would punish Defendants for their conduct and which would deter other manufacturers from engaging in such misconduct in the future.

### Count XI – Punitive Damages

161.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

162.   Plaintiffs are entitled to punitive damages because Defendants' actions were reckless and without regard for the public's safety and welfare. Defendants misled both the medical community and the public at large, including Mr. Mathis and his physicians, by making false representations about and concealing pertinent information regarding Trasylol. Defendants downplayed, understated and disregarded its knowledge of the serious and permanent side effects associated with the use of Trasylol, despite information demonstrating the product was unreasonably dangerous.

163. The conduct of the Defendants in designing, testing, manufacturing, promoting, advertising, selling, marketing, and distributing Trasylol, and in failing to warn Plaintiffs and other members of the public of the dangers inherent in the use of Trasylol, which were known to the Defendants, was attended by circumstances of fraud, malice, or willful and wanton conduct, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, including Plaintiffs.

164.   At all times material hereto, Defendants had a duty to exercise reasonable care in the design, manufacture, testing, research and development, processing, advertising, marketing, labeling, packaging, distribution, promotion and sale of Trasylol.

165.   Defendants breached their duty and were wanton and reckless in their actions, misrepresentations, and omissions toward the public generally, and Plaintiffs specifically, in the following ways:

(1) Defendants actually knew of Trasylol's defective nature, as set forth herein, but continued to design, manufacture, market, and sell Trasylol so as to maximize sales and profits at the expense of the health and safety of the

consuming public, including Plaintiffs, and in conscious disregard of the foreseeable harm caused by Trasylol;

(2) Defendants spent millions of dollars a year researching and developing medicines and aggressively marketing Trasylol, but devoted far less attention to conducting sufficient pre-clinical testing, clinical testing, comparison testing, and adequate post-marketing surveillance of this drug;

(3) Defendants violated state and/or federal laws by selling and distributing a drug product that was misbranded and/or adulterated under the federal Food, Drug and Cosmetic Act, 21 U.S.C. § 321 *et seq.* and parallel state Food, Drug and Cosmetic Acts and state common law; and

(4) Defendants continued to promote the safety of Trasylol, while providing no warnings at all about the unreasonable risk to consumers of death, kidney failure, congestive heart failure, and stroke associated with it, even after Defendants knew of that risk from multiple studies.

166.    Defendants knew that Trasylol had unreasonably dangerous risks and caused serious side effects of which Mr. Mathis and his physicians would not be aware. Defendants nevertheless advertised, marketed, distributed, and sold the medicine knowing that there were safer methods and products available.

167.    Defendants' above-described actions were performed willfully, intentionally, and with reckless disregard for the rights of Mr. Mathis and the public.

168.    One or more of the aforementioned violations of law by the Defendants were committed with reckless disregard for the safety of the public and of Plaintiffs as a product user.

169.   One or more of the aforementioned violations of law by Defendants were committed willfully and deliberately, and caused substantial financial injury to the consuming public and Plaintiffs.

170.   As a direct and proximate result of the wanton and reckless actions and inactions of the Defendants as set forth above, Plaintiffs are entitled to punitive damages.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, on the claims stated above.

## COUNT XII - LOSS OF CONSORTIUM

171.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

172.   At all times relevant hereto, the Mr. Mathis' spouse suffered injuries and losses as a result of his injuries.

173.   Mr. Mathis' spouse has necessarily paid and have become liable to pay for medical aid, treatment and for medications, and will necessarily incur further expenses of a similar nature in the future as a proximate result of Defendants' conduct.

174.   Mr. Mathis' spouse and/or family members have suffered and will continue to suffer the loss of their loved one's support, companionship, services, society, love, and affection.

175.   For Mr. Mathis' spouse, Plaintiffs allege their marital relationship was been impaired and depreciated, and the marital association between husband and wife was been altered.

176.   Mr. Mathis' spouse has suffered great emotional pain and mental anguish.

177. As a direct and proximate result of Defendants' wrongful conduct, Mr. Mathis' spouse and family members have sustained and will continue to sustain severe injuries, severe emotional distress, economic losses, and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial.

178. Defendants are liable to Plaintiffs jointly and/or severally for all general, special and equitable relief to which they are entitled by law.

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, on the claims stated above and requests that the Court award compensatory and punitive damages and all other relief this Court or a jury finds just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL**

**PLAINTIFFS**

**By Counsel**

*/s/ Kerrie W. Boyle*
P. Gregory Haddad (WVSB #5834)
*ghaddad@baileyglasser.com*
Kerrie Wagoner Boyle (WVSB #9439)
*kboyle@baileyglasser.com*
Jonathan D. Boggs (WVSB #7927)
*jboggs@baileyglasser.com*
Bailey & Glasser, LLP
209 Capitol Street
Charleston, WV  25301
(304) 345-6555 – telephone
(304) 342-1110 – facsimile